## *In Re* JOHN DUGAN.

1. A purely legislative power cannot be delegated by Congress.
2. The Act of March 3d, 1863, conferred no power upon the President to suspend the privilege of the writ of *habeas corpus.* He derives that power directly from the Constitution itself.
3. The power to suspend this writ is not given to Congress; it rests, under the Constitution, with the President alone.

Decided January 24, 1865.

HEARING on *habeas corpus* in the General Term in the first instance.

THE FACTS are sufficiently stated in the opinion.

MR. J. H. BRADLEY, for the petitioner.

MR. JUSTICE OLIN delivered the opinion of the Court.

A writ of *habeas corpus* was issued in this case on the petition of Catherine Dugan, to cause to be brought before this Court the body of John Dugan, her husband. The petition states, in substance, that John Dugan was arrested some time in May last, by a subordinate of one Lafayette C. Baker, claiming to act under the authority of the War Department, and without any warrant or other process for the arrest of said Dugan; that he was committed to the prison known as the Carroll prison, where he has ever since remained; that the Secretary of War has never reported to this Court the arrest and imprisonment of the said John Dugan, as required by law; that two terms of the Criminal Court of this District have been held and finished, and two grand juries empaneled and discharged since the arrest and imprisonment of the said John Dugan, and that no presentment or indictment has been found against him, nor has he had any judicial or other examination. Upon the service of this writ, the person having the custody of the said

Dugan makes return thereto, that the body of John Dugan was in his custody; that he was arrested and imprisoned by the authority of the President of the United States, and that he does not produce the body of the said John Dugan, by reason of the order of the President of the United States endorsed upon said writ, to which endorsement reference is made.

The endorsement referred to is as follows:

"The within named John Dugan was arrested on and is imprisoned by my authority. This writ of *habeas corpus* is suspended, and the officer having Dugan in custody is directed not to produce his body, but to hold him in custody until further order, giving this order on your return to the Court.

                              "A. Lincoln."

The question in this case arises on a motion for leave to traverse the sufficiency of the return to the writ.

It is contended by the learned counsel for the petitioner, that under and by virtue of the first and second sections of the Act of Congress "relating to *habeas corpus* and regulating judicial proceedings in certain cases" passed March 3, 1863, the said John Dugan is entitled to a discharge from his imprisonment. Those two sections are as follows:

"That during the present rebellion the President of the United States whenever in his judgment the public safety may require it, is authorized to suspend the privilege of the writ of *habeas corpus* in any case, throughout the United States, or any part thereof. And whenever and wherever the said privilege shall be suspended, as aforesaid, no military or other officer shall be compelled in answer to any writ of *habeas corpus* to return the body of any prisoner or persons detained by him, by the President, but upon the certificate, under oath of the officer having charge of any one so detained, that such person is detained by him as a prisoner under authority of the President, further proceed-

ings under the writ of *habeas corpus* shall be suspended by the judge or court having issued the said writ, so long as said suspension by the President shall remain in force, and said rebellion continue.

SEC. 21. *And be it further enacted*, That the Secretary of State and the Secretary of War be, and they are hereby directed, as soon as may be practicable to furnish to the judges of the Circuit and District Courts of the United States and of the District of Columbia, a list of the names of all persons, citizens of States in which the administration of the laws has continued unimpaired in the said Federal Courts, who are now, or may hereafter be, held prisoners of the United States by order or authority of the President of the United States, or either of said Secretaries in any fort, arsenal, or other place as State or political prisoners, or otherwise than as prisoners of war; the said list to contain the names of all those who reside in the respective jurisdictions of said judges, or who may be deemed by the said Secretaries or either of them to have violated any law of the United States, in any of said jurisdictions, and also the date of each arrest, the Secretary of State to furnish a list of such persons as are imprisoned by the order or authority of the President, acting through the State Department; and the Secretary of War a list of such as are imprisoned by the order or authority of the President, acting through the Department of War. And in all cases where a grand jury having attended any of said Courts having jurisdiction in the premises, after the passage of the act, and after the furnishing of said list as aforesaid, has terminated its session without finding an indictment or presentment, or other proceeding against any such person, it shall be the duty of the judge of said Court forthwith to make an order that any such prisoner desiring a discharge from said imprisonment, be brought before him to be discharged. And every officer of the United States having custody of such prisoner is hereby directed immediately to obey and execute said judge's

order, and in case he shall delay or refuse so to do, he shall be subject to indictment for a misdemeanor, and be punished by a fine of not less than five hundred dollars and imprisonment in the common jail for a period not less than six months, in the discretion of the Court. *Provided however*, That no person shall be discharged by virtue of the provisions of this act until after he or she shall have taken an oath of allegiance to the Government of the United States, and to support the Constitution thereof, and that he or she will not hereafter in any way encourage or give aid and comfort to the present rebellion, or the supporters thereof. *And provided*, also, that the judge or court before whom such person may be brought, before discharging him or her from imprisonment, shall have power on examination of the case, and if the public safety shall require it, shall be required to cause him or her to enter *into recognizance* with or without surety, in a sum to be fixed by said judge or court to keep the peace and be of good behavior towards the United States and its citizens, and from time to time, and at such times as such judge or court may direct, appear before such judge or court to be further dealt with according to law, as the circumstances may require. And it shall be the duty of the District Attorney of the United States to attend such examination before the judge."

The third section of the act provides, in substance, that when any person thus imprisoned has been indicted for any offense which by the existing laws is bailable, the judge may let such person to bail; and it further provides that "in case the Secretaries of State and War shall for any reason refuse or omit to furnish the said list of persons held as prisoners as aforesaid, at the time of the passage of this act, within twenty days thereafter, and of such persons as hereafter may be arrested within twenty days from the time of the arrest, any citizen may, after a grand jury shall have terminated its session without finding an indictment or presentment, as provided in the second section of this

act, by a petition alleging the facts aforesaid touching any of the prisoners so as aforesaid imprisoned, supported by the oath of such petitioner, or any other credible person, obtain and be entitled to have the said judge's order to discharge such prisoner on the same terms and conditions prescribed in the second section of this act: *Provided, however*, That the said judge shall be satisfied such allegations are true."

These are all the provisions of the sections of the 3d of March, 1863, which have any bearing upon the question presented for our consideration.

It requires but a casual examination of the first, second and third sections of this act to perceive that the question in this case presented for our consideration, whether the power to suspend the privileges of the writ of *habeas corpus* is under the Constitution an executive power to be exercised by the President of the United States in the exigencies therein mentioned; or whether it is a legislative power vested in Congress alone.

A question of deeper interest or more grave importance has seldom been presented to the consideration of any court. It is quite apparent that if the power to suspend the privilege of the writ of *habeas corpus* is conferred upon the president by the first section of this act, the exercise of that power is limited in the manner prescribed in the second and third sections of the same act; the first section providing that the president may in all cases during the existence of this rebellion, when in his judgment the public safety may require it, suspend the privilege of the writ, and the second and third sections providing that of any person be arrested by authority of the president and imprisoned for the period of twenty days, and after a grand jury having jurisdiction of the offense with which the prisoner is charged, shall have been empanneled and discharged without finding an indictment or presentment against the person so imprisoned, such person shall be entitled to the writ

of *habeas corpus*, and be discharged from imprisonment, unless in the opinion of the judge or court before whom the prisoner is brought, the public safety may require such prisoner to enter into recognizance, &c., to keep the peace and be of good behavior towards the United States and its citizens. In short, the first section declares that the president shall have power to suspend the privilege of the writ in all cases, and the second and third sections declare that under the circumstances mentioned therein the privilege of the writ shall not be suspended. By every rule of interpretation the second and third sections of the act must be held to qualify the first, and provide that under the circumstances mentioned in the second and third sections, the privilege of the writ shall not be suspended. The question then recurs, did the act of Congress of the 3d of March, 1863, confer upon the president the power to suspend the privilege of the writ of *habeas corpus?*

We are of opinion that it did not, for the following reasons:

If it be conceded that the power to suspend the privilege of the writ of *habeas corpus* is by the Constitution of the United States conferred upon Congress, and is purely a legislative power, it seems quite clear to us that Congress cannot delegate the exercise of that power to any other Department of the Government.

The provision of the Constitution is: "The privilege of the writ of *habeas corpus* shall not be suspended unless when in cases of rebellion or invasion the public safety may require it." If this be a legislative power, is it not manifest that upon Congress alone is *devolved the duty and responsibility of judging when the public safety requires the exercise of that power?* The great fundamental idea lying at the foundation of the Federal Constitution is a clear and well defined division of the powers of Government into three great departments, viz, executive, legislative, and judicial; each independent of the other, and yet so harmonized that each may act in

co-operation with the other in the execution of the powers conferred upon them respectively. To hold that either of these great departments of the Government may abdicate the powers conferred on it by the Constitution and delegate their exercise to some other department would subvert the great central idea of the Federal Constitution in respect to the division of these powers of Government. This idea of a division of powers was deemed by the founders of our Government the best to guarantee for the faithful and wise exercise of those powers, and the surest protection and security for the liberties of the citizens. The executive is charged by the Constitution with the duty of executing the laws, Congress with power of making the law, and the judiciary with the duty of interpreting them. As well might Congress assume to confer upon the Supreme Court of the United States the power to enact all necessary laws during the existence of the present rebellion as to confer upon the Executive Department the exercise of any purely legislative power.

The act of Congress in question does not suspend the privilege of the writ of *habeas corpus* in any case or profess to do so. It simply provides that "the President of the United States whenever, in *his judgment the public safety may require it*, is authorized to suspend the privilege of the writ of *habeas corpus* in any case throughout the United States or any part thereof." If this power to suspend the privilege of this writ be vested in Congress, the act of the 3rd of March is a perfect and complete abnegation of that power and attempts to delegate its exercise to the President. What would be thought of a Congress which should provide that the marshal of the District of Columbia might suspend the privilege of the writ of *habeas corpus* whenever in his judgment the public safety required it during the existence of the present Rebellion? Surely, if Congress can abdicate its legislative powers in favor of the President, it may do so in favor of any one else. It is not a question as to the

*18*

character of the agent to be selected, but whether any one can be selected at all.

. We are not advised whether the question of the power of Congress to delegate the exercise of any of its legislative powers has ever been passed upon by the Supreme Court of the United States. The question has, however, not unfrequently arisen and been adjudicated by the highest judicial tribunals of several of the States, all having written constitutions formed upon the model of those of the general Government providing for a division of the powers possessed by the State into executive, legislative and judicial, and so far as we are aware, it has been uniformly held that a purely legislative power could not be delegated by the legislative to any other officer or body of men, or even be surrendered to the people, the source of all power by the theory of our Government.

We have thus far attempted to show that the act of the 3d of March, 1863, conferred no power upon the President to suspend the privilege of the writ of *habeas corpus*, even though it be conceded that the power to suspend the privilege of the writ is by the Constitution conferred on Congress alone as one of its undoubted legislative powers.

The remaining question to be considered in this case is, whether by the Constitution the power to suspend the privilege of the writ of *habeas corpus* is conferred upon the legislative or executive department of the Government.

The provision of the Constitution is as follows :

"The privilege of the writ of *habeas corpus* shall not be suspended, unless when, in cases of Rebellion or invasion, the public safety may require it."

The writ of *habeas corpus* is of common law origin, and it has been confirmed by various acts of the Parliament of Great Britain, and more especially by the 31st of Charles II, chap. 2d. It was a writ issued on petition, directed to the person having in custody any one imprisoned or restrained of his liberty, commanding him to produce the body of the

prisoner before the judge or Court, issuing the writ, "*with the day and cause of his caption and detention.*" And if in no legal or sufficient cause was made to appear for his imprisonment or detention he was of right entitled to be discharged from imprisonment.

If, on the contrary, it appeared to such judge or Court that there were reasonable grounds of suspecting the prisoner to be guilty of some offense, the prisoner was entitled to furnish bail if the offense was bailable, and be discharged from imprisonment; and if not bailable, he was entitled to a trial without arbitrary delay.

This exposition of the nature and province of the writ of *habeas corpus* will enable us to understand clearly what is meant by the provision of the Constitution above quoted, viz: "The privilege of this writ shall not be suspended unless when in cases of rebellion or invasion the public safety may require it." That is, the right of the citizen to be discharged from imprisonment unless legal cause can be shown for his detention; the right to give bail if the offense charged be bailable, and if not bailable, the right to a speedy trial and without arbitrary delay. These are the privileges of the writ of *habeas corpus*, and the Constitution says this privilege may be suspended in times of rebellion or invasion, when the public safety may require it.

It will be observed that no intimation is contained in the provision before quoted as to which of the three great departments of the General Government is given the power to suspend the privilege of this writ.

It has been argued that from the collocation of this provision it may be properly inferred the power was designed to be conferred upon Congress. But this argument will be entitled to no weight when the history and origin of this provision is considered in the light of the few facts respecting it which have come down to us from the convention which framed the Federal Constitution.

It is known that shortly after the meeting of that convention Charles Pinckney, of South Carolina, drew up a "plan of a Federal Constitution." In the sixth article of that plan, and among the provisions relating to the powers proposed to be conferred upon the legislature was the following:

"All laws regulating commerce shall require the assent of two-thirds of the members present in each house. The United States shall not grant any title of nobility. The legislature of the United States shall pass no law upon the subject of religion, nor touching or abridging the liberty of the press; nor *shall the privilege of the writ of habeas corpus ever be suspended* except in cases of rebellion or invasion."

In this proposed provision, the idea is dimly shadowed forth that the suspension of the privilege of the writ was regarded by Mr. Pinckney as a proper power to be conferred on the legislature. We hear nothing further of this "plan for a Federal Constitution," so far as it related to the writ of *habeas corpus.* At a subsequent period of the session of the convention, Mr. Pinckney moved a number of propositions to be referred to a committee of the convention, and among them was the following:

"The privileges and benefits of the writ of *habeas corpus* shall be enjoyed in this Government in the most expeditious and ample manner, and shall not be suspended by the legislature, except upon the most urgent and pressing occasions and for a limited time not exceeding —— months."

When this subject came up before the convention, Mr. Pinckney moved to fill the blank with the word "twelve." Mr. Rutledge is reported to have said that he was for declaring the *habeas corpus* inviolate. He did not conceive that a suspension could ever become necessary at the same time in all the States.

Thereupon Governor Morris moved as an amendment to

one of the articles pertaining to the judiciary, the following:

"The privilege of the writ of *habeas corpus* shall not be suspended, unless *where*, in cases of Rebellion or invasion, the public safety may require it."

This motion was adopted by the convention; but the provisions of the Constitution, when adopted by the convention, were subjected to the criticism of a committee of style and arrangement, not however, empowered to alter the meaning of any provision adopted by the convention. By this committee the provision in question was amended by substituting the word "when" for the word "where," and placed where we now find it—section nine of article one—in conjunction with various other provisions, all of which are either limitations of the power of the general Government or of the executive department thereof.

Such is believed to be the true history of the origin of the provision in respect to the writ of *habeas corpus* found in the Federal Constitution, and of the place it now occupies in that instrument. If this be so, it will, we think, readily be admitted that no argument can be adduced from its mere location in the Constitution in favor of its being designed as one of the legislative powers of the Government. On the other hand, a strong presumption to the contrary, we think, arises from the significant omission of the word legislative, as contained in Mr. Pinckney's resolution, and likewise from the fact that the provision was actually adopted by the convention as an amendment to that of the Constitution pertaining to the judiciary.

But probably, the usual argument relied on to show the provision in question to be a grant of legislative power, is drawn from the supposed analogy of the provision in question to the English constitution, which vests in Parliament the power to suspend the writ of *habeas corpus* or rather, the power to repeal the act known as the *habeas corpus* act. A

moment's reflection will serve to show that arguments drawn from such a source are often deceptive and fallacious. The Constitution of England however worthy it may be of the admiration so often expressed for it by great and good men, is nothing more or less than just what Parliament may choose to declare it to be. Ours is a *written* Constitution, conferring upon the Government certain defined and limited powers.

The sovereign of Great Britain in whom is vested the executive power, rules by the accident of birth, and by the theory of the English constitution, "can do no wrong." The executive power under our Constitution is vested in a President, elected by the people every four years, and like all other officers of the Republic, amenable to the law and liable to be removed and punished for every intentional violation of it.

It may not be inappropriate to give in this connection a summary of the powers vested in the sovereign of Great Britain, and of those vested by our Constitution in the President. We quote from a treatise of that eminent jurist, Horace Binney, upon the subject of the power to suspend the privilege of the writ of *habeas corpus* published in 1862. Speaking of the powers conferred by the English constitution on the sovereign of England he enumerates the following: "The exclusive right to declare war and to make treaties with foreign powers without the advice or consent of either branch of the legislature, the power to build ships and to regulate the navy; the power of calling forth the militia for any cause, which, in the king's judgment makes it expedient, the sole and exclusive power of appointments to office, both civil and military; the power of appointment to great offices in the established church; the power of conferring upon such subjects as the crown favors both rank and title and, hereditary authority as law-

makers in one branch of the legislature and the power of absolute veto upon any acts of parliament.

Contrast these powers with the summary given by the same learned author of those conferred upon the President:

"The President has no powers that can be abused or enlarged by himself, except with more danger to himself than to the country. Elected directly, or indirectly, by the people for a short term of years, unable to veto a law of Congress if two-thirds of each house shall concur in passing it against his advice, unable to make war, or to arm a soldier, or to call forth the militia for any purpose, or to build a ship, or to enlist a sailor or marine, unable to make a treaty unless two-thirds of the senators present concur, or to appoint an embassador, minister, consul, judge, or any other officer without the advice and consent of the Senate."

These radical and distinctive differences alone may serve to show how dangerous might be the power to suspend the writ, "or the privilege of the writ of *habeas corpus*," in the hands of one, and how safe for the just liberties of the people it would be in the hands of the other, especially when the exercise of that power is limited to the cases of rebellion or invasion, and then only when the public safety requires such suspension.

The experience of over sixty years has taught us that the power to make laws, even under a written constitution prescribing the limits of legislation, is a formidable and vast one; that the power to interpret them and declare their obligation is scarcely less so, while the simple power to execute those laws would seem to be a comparatively inferior or subordinate one.

More than half a century's experience in the practical operation of our Government has dispelled all fear of encroachment upon the liberties of the citizen by the executive power; and it is only since the commencement of

this rebellion that such fears have been expressed chiefly by the open or covert enemies of the Republic.

Again, if we consider for a moment the nature of the power conferred by this provision of the Constitution, we think it will be found wholly incompatible with the legislative function, while it is eminently necessary and proper in aid of the executive power.

Bear in mind the meaning we have given of the provision in question. It would seem to imply the exercise of this power in respect to individual cases, each one depending on its own peculiar circumstances, concerning which Congress would have no means of judging, and by reason of its not being a permanent body, frequently no opportunity to judge at all.

The power granted, whether conferred upon the executive or Congress, is doubtless ample and sufficient to authorize either to declare the privilege of the writ suspended in any or all of the States of the Union; but such an exercise of authority would seem to be an abuse of power. For instance, individual cases may have occurred in the State of New York in which the suspension of the privileges of the writ was eminently proper, and yet it would be justly felt as oppressive and unnecessary to make the suspension applicable to all the loyal citizens of the State.

Again, the President is charged with the faithful execution of the laws, and by consequence is empowered to use every necessary and legal means in aid of their execution. Rebellion and invasion at once put an end to the peaceful operation of the laws. The executive power of the Government is first brought in collision, and is just made acquainted with the nature and extent of the danger threatening the Republic, and is best qualified to judge of the means requisite to be employed for its preservation.

The power to suspend the privilege of the writ of *habeas corpus* in time of rebellion and insurrection, when the pub-

lic safety may require it, is expressly given in the Constitution. The President is charged with the duty of seeing that the laws are faithfully executed. The Supreme Court has held over and over again, that the power to do an act necessarily includes the power to use any appropriate means to it. In case 4th Wheaton, 316, Chief Justice Marshall says: " The powers given to the Government imply the ordinary means of execution and the Government, in all sound reason and fair interpretation, must have the choice of the means it deems the most convenient and appropriate to the execution of the power."

The principle here announced applies with equal force to each of the three great departments of the Government. If this be so, why should not the President exercise the power to suspend the privilege of the writ of *habeas corpus*, especially if the exercise of that power be found by the President, as Commander-in-Chief of the Army, one of the most efficient and absolutely necessary means to be employed in the suppression of this rebellion.

The exigencies of this great rebellion within a few days after the 4th of March, 1861, forced upon the Executive Department of the Government the consideration of the question whether the President as Commander-in-Chief 'of the Army might exercise the power to suspend the privilege of the writ of *habeas corpus*. Acting under the advice of his cabinet, some of whom by common consent are among the most distinguished jurists of the country, he assumed the responsibility of suspending the privilege of the writ, and by so doing preserved to the Republic the possession of at least two most important fortresses.

At the extra session of Congress, calling to meet on the 4th of July, 1861, the President in his message communicated to that body the fact of the exercise of such power, and his reasons for it; and so far as we are advised, no complaint or exception was made by either House of Con-

*19*

gress as to its being an assumption of legislative power conferred by the Constitution upon Congress alone. The Act of the 3d of March, 1863, is, by no means, to be regarded as a protest against the right of the Executive Department of the Government to exercise the powers it assumed, but was enacted from "abundant caution" to justify such exercise of authority if, as claimed by some, the provision should be finally declared to be a grant of legislative power.

We now come to consider whether there is any authoritative adjudication as to whether the provision in question be a grant of legislative or executive power. So far as we are advised, there is absolutely none upon this subject.

We regard it as one of the chief glories of our form of Government that no citizen of the Republic, for upwards of seventy years, has provoked the exercise of the power to suspend the privilege of the writ of *habeas corpus*, and thereby obtain a judicial construction as to which department of the General Government is vested with the power in question.

In the case of *ex parte* Bolman Case, Chief Justice Marshall is reported to have used language which would imply that the power in question is vested in Congress; but the decision of that case did not involve the question before us, and of course could not have received that discussion and careful consideration which would entitle it to be regarded as authoritative. Had this question been presented for adjudication to that eminent judge, he doubtless would have brought to its consideration the unsurpassed powers of his intellect, and his great and varied learning, and whatever conclusion he had arrived at by common consent would have been regarded as an end of all controversy upon this subject. We need not add that no court feels constrained to follow the *obiter dictum* or casual remark of any judge not necessary to the decision of a case before him.

Story and Rawle, in their commentaries upon the Con-

stitution have apparently adopted the suggestion of Chief Justice Marshall in the case of *ex parte* Bolman, and regarded the provision in question as a grant of legislative power. However that may be, we think it is quite apparent from the operations contained in the respective works of these learned commentators upon this subject that little reflection or examination was given to the origin and nature of the power in question. They seem to have been misled by the supposed analogy between the provision contained in the Federal Constitution and the power claimed and exercised by the Parliament of England to suspend at its pleasure the act of *habeas corpus*.

The late and venerable Chief Justice Taney, in his decision of the case of *ex parte* Merriman, reported in the July number of the *Law Register*, announced certain doctrines which it is conceded are wholly at war with the views we have expressed, but they seem to us so directly and radically opposed to the opinion of the Supreme Court in the case of Luther *vs.* Borden, 7 Howard 1, delivered by the same learned judge, that it is hardly worth our while to attempt an answer to the reasoning contained in it. It is sufficient to say that if the principles announced in the case of *ex parte* Merriman be law, it is the duty of the Supreme Court, on the first fitting occasion to reverse their decision in the case of Luther *vs.* Borden.

To hold that after thirteen States of the Federal Union had abjured their allegiance to the Government, and organized an armed rebellion for its dismemberment and overthrow, that the only power conferred by the Constitution and laws upon the President, was to act as an assistant of a United States marshal heading a *posse comitatus* in an attempt to serve legal process, would seem to require neither comment or answer.

The views above expressed renders it unnecessary for us to answer in detail the very able and learned argument of

the counsel for the petitioner. We are not insensible, I trust, to the vast importance of the question presented for our consideration. If the conclusion at which we have arrived be erroneous, we have the consolation of knowing that our error can be corrected by an appellate tribunal, to whose decision we shall bow with respectful reverence.

Perhaps the experience of the last four years has prejudiced our judgment. We, together with a vast majority of the loyal people of the Republic, have regarded every possible vigorous and legal exercise of executive power for the suppression of the existing rebellion, not only as the legal right, but the solemn and sworn duty of the President.

*The return to this writ is held to be sufficient, and the writ must be dismissed.*